C. Harry Blunt v. Commissioner. C. Harry Blunt and Anne Blunt v. Commissioner.
Blunt v. Commissioner
Docket Nos. 392-62, 393-62.
United States Tax Court
T.C. Memo 1966-280; 1966 Tax Ct. Memo LEXIS 1; 25 T.C.M. (CCH) 1445; T.C.M. (RIA) 660280; December 30, 1966
Gene F. Reardon, for the petitioners. Richard J. Shipley, for the respondent. DRENNEN
Memorandum Findings of Fact and Opinion DRENNEN, Judge: Respondent determined deficiencies in Federal income tax and additions to tax as follows: Additions to tax
I.R.C.
I.R.C.
I.R.C. Docket
1939 Sec.
1954 Sec.
1939 Sec. No.
Petitioner
Year
Deficiency
293(b)
6653(b)
294(d)(2)
392-62
C. Harry Blunt
1949
$4,838.24
$2,419.12
1950
3,800.14
1,900.07
$ 226.87
1951
4,072.61
2,036.31
244.42
1952
9,267.04
4,633.52
562.02
1953
2,458.29
1,229.15
145.10
1954
3,996.05
$1,998.03
254.58
393-62
C. Harry Blunt and Anne Blunt
1955
177.29
1956
195.56
1957
560.60
1958
229.74
1959
873.84
*4 Some of the issues have been conceded, and the issues remaining for decision are: (1) Whether income from the Blunt Mortuary business for the taxable years 1949 through 1954 should be allocated between petitioner C. Harry Blunt (hereinafter referred to as Harry), Evelyn Blunt Conkey, and Anne Blunt; or whether such income is taxable solely to Harry. (2) Whether Harry omitted and understated specific items of gross receipts from the Blunt Mortuary business for the years 1949 through 1955. (3) Whether petitioners are entitled to additional deductions for business expenses paid by check. (4) Whether petitioners are entitled to additional deductions for business expenses paid by cash. (5) Whether petitioners are entitled to additional deductions for depreciation, beyond the amounts allowed by respondent in the notices of deficiency. (6) Whether petitioners are entitled to itemized deductions for the years 1949 through 1954. (7) Allowable deductions for property taxes and utilities. (8) Allowable itemized deductions for medical expenses, contributions, and other deductions. (9) Deductibility of expenses incurred as mayor and city councilman. (10) Whether petitioner *5 is liable for an addition to tax for the year 1954 under section 294(d)(2), I.R.C. 1939. (11) Whether petitioner is liable for additions to the tax for fraud for the years 1949 through 1954 under sections 293(b), I.R.C. 1939, and 6653(b), I.R.C. 1954. (12) Whether assessment of deficiencies for the years 1949 through 1957 are barred by the statute of limitations. Findings of Fact The stipulated facts are incorporated herein by this reference. Harry and Anne Blunt were husband and wife, residing at Colorado Springs, Colo., for the taxable years here involved. For the years 1949 through 1954 Harry filed individual tax returns, and for the years 1955 through 1959 Harry and Anne filed joint income tax returns, all on the cash basis of accounting, with the district director of internal revenue, Denver, Colo. Anne filed no tax returns for the years 1949 through 1954. Harry died subsequent to the trial of this case. Harry graduated from Colorado College in Colorado Springs in 1930 with a bachelor of arts degree, his major field of study having been economics. During the years in question Harry was engaged in the mortuary business in Colorado Springs. Harry *6 also served as city councilman from 1942 through 1959 and as mayor of Colorado Springs from 1951 to 1957. From 1920 to the date of trial of this case there had been a mortuary business in Colorado Springs known as Blunt Mortuary. This mortuary was operated by Harry's father, George Blunt, until his death on December 1, 1942. Harry became associated with his father in this business, which was unincorporated, in 1927 and shared in the business with his father until the father's death in 1942. Thereafter Harry continued to operate the business individually throughout the years here involved. The mortuary business was conducted in a building on a lot owned originally by Harry's father located in the western part of Colorado Springs. When George died his wife, Nellie, his only son, Harry, and his only daughter, Evelyn Blunt Conkey, each inherited a one-third interest in this real estate. Upon the death of Nellie on March 2, 1951, Harry and Evelyn each inherited one-half of Nellie's interest in the real estate and they both continued to own a one-half interest in the entire property from that time and throughout the years in question. The building in which the mortuary business was conducted *7 was constructed of block exterior walls of stucco with an asphalt roof, wood frame partitions, and interior walls and ceilings of plaster. It contained a small basement for storage and furnace, one kitchen, one bath, and three restrooms. There was an entrance foyer, a family room, an office, a chapel, and storage space on the first floor; and there were a four-room apartment, restrooms, and salesroom on the second floor; with a built-in garage in the rear of the first floor. A receipt for inheritance tax issued by the Office of the Treasurer of the State of Colorado, shortly after George's death in 1942, indicated that the mortuary lot with all improvements was appraised at $15,000 at that time, although the estate was apparently nontaxable. This receipt also indicated that the undivided one-half interest owned by George in the Blunt Mortuary business passed to Harry on George's death. This property was appraised in 1965 by an experineced real estate consultant and appraiser of Colorado Springs who placed a value on the improvements, determined by computing the cost of replacing the building on the respective valuation dates at the then-prevailing costs of construction, of $30,000 *8 in 1935 and $45,000 in 1942. He also testified that the building had a value of $45,000 in 1951, representing an increased cost of replacing the building in 1951 less depreciation incurred. The only substantial improvements made to the building between 1942 and 1959 were remodeling the kitchen in 1951 and the installation of air conditioning. Harry and Anne, and Harry's mother, Nellie, lived in the apartment on the second floor of the mortuary building until Nellie's death in 1951, after which Harry and Anne continued to live there. About 25 percent of the building was used as living quarters for the Blunts. No rent was paid by Harry or the business for use of the mortuary building. Harry supported Nellie while she lived and claimed her as a dependent on his tax returns for 1949 and 1950. Anne helped Harry in the conduct of the business but received no direct compensation therefor. Harry's sister, Evelyn, also helped in the conduct of the business at times. She usually played the organ at funerals conducted at the mortuary. On occasions when Harry was ill or out of town, Evelyn moved into the apartment in the mortuary and assisted in the business. Evelyn did not receive any specific *9 form of compensation from the business, nor did she receive any rent for her share of the property. However, Harry did make gifts to her from time to time and provided her with an automobile for her personal use. Evelyn did not consider that she owned any interest in the business (as distinct from the property) and she never received any accounting from the business or division of profits. In addition to Harry, Anne, and Evelyn, one full-time employee was normally employed in the business to do the embalming and assist in other phases of the business. Also Harry had other people on call to help out when assistance was needed, whom he paid on an hourly basis. Harry usually sang at the funerals himself but others were employed at times to play the organ and drive cars at funerals and to do odd jobs around the mortuary. Three separate means of recording income were utilized in the conduct of the Blunt Mortuary business during the years 1949 through 1954. Initially details of a particular transaction were recorded in little memorandum booklets (hereinafter referred to as the first-call booklets). These booklets were paperbound, were printed for this purpose for use by the Blunt Mortuary, *10 and contained enough pages to make a record of 10 funerals. Entries in these first-call booklets ran chronologically according to the date of death of the decedent, the first page for each funeral being headed "Funeral Record" and the facing or second page being headed "Bill of Items." Entries on the "Funeral Record" page typically contained information, in spaces designated, with respect to the following vital statistics: Name, place of death, residence, date of birth, date of death, age, sex, color, marital status, occupation, birthplace, mother's maiden name, "Came to Colo. Springs," father's name, Social Security number, cause of death, physician, place of burial, date of service, clergyman, near relatives, and general remarks concerning the deceased. The page entitled "Bill of Items" had spaces at the top to record "Ordered by," "Charged to," and "Address," and under that spaces to record the amounts of the following itemized charges: Casket, vault or outside box, burial suit, embalming, hearse, automobiles, State tax, minister, cemetery charges, telegrams, telephone, and miscellaneous. In most instances the details of the funerals conducted by Blunt Mortuary were rather fully *11 reported, although the itemized costs were usually allocated to only a few specific items. Typically, the record of a funeral included an itemized charge for casket, State tax, and cemetery charge, it being Harry's custom to lump most of the other items into the charge for the casket. The total of the itemized charges would be entered as the "Total Debit" at the bottom of the column. Spaces at the bottom of the page were provided to record credits or payments, and the date, amount of credit or payment, and the balance due were recorded in these spaces. At times the initial entries with respect to a funeral were jotted down on a daily calendar by whoever talked to the customer and were later transcribed to either the first-call booklets or the funeral record cards mentioned below. Information contained in the first-call booklets was transcribed to 5- by 8-inch index cards (hereinafter referred to as funeral record cards) which similarly provided space for complete information on decedent's vital statistics, the nature of arrangements for the funeral, the charges involved, and payments or credits on the account. These cards were headed with the name of the deceased and were kept in *12 alphabetical order so the information with respect to a particular funeral or deceased could be readily located, which could not be done from the first-call booklets unless the approximate date of the funeral was known. The third set of records utilized by Harry in the ordinary course of the Blunt Mortuary business was a ledger journal entitled "Rex Tax Record For Funeral Directors" (hereinafter referred to as the Rex journal). These records were 14- by 9-inch leather or plastic-covered books and contained about 65 printed pages designed to record receipts on one side and expenditures on the facing page, with printed instructions on how to use it. The Rex journal provided numerous columns on the expenditures page to record specific expenditures, to whom paid, and the number of the check used to make the payment. The Rex journals offered in evidence ran chronologically from May 20, 1946, to February 3, 1955. While other people at the mortuary at times made the entries in the first-call booklets and on the funeral record cards, Harry made the entries in the Rex journal, presumably taking the information contained therein from the funeral record cards and/or the first-call booklets. *13 Harry also prepared his own tax returns for the years 1949 through 1954, after which he employed a certified public accountant to make the returns. This accountant also installed cash receipts and disbursements journals for the business. During the years involved Harry maintained two bank accounts for the business, one a checking account and the other a special savings account. The business receipts recorded in the Rex journals for the years 1949 through 1954 were all deposited in the checking account and checks were drawn on this account to pay the expenditures recorded in the Rex journals. All deposits in the checking account, but only such deposits, were recorded as gross receipts from the business in the Rex journals and all expenditures recorded therein were paid by checks drawn on this account. Harry reported the gross receipts recorded in the Rex journals as gross income of the business on his income tax returns for the years 1949-54 and claimed as business expenses all of the expenditures recorded in the Rex journals except those entered in the column headed "Salaries," as discussed below. Harry did not include in income on his returns for 1949-54 any receipts that may not *14 have been deposited in the checking account and he deducted no expenditures that may have been made in cash. The "Business Expenses Paid" pages in the Rex journals had numerous columns in which the date of the expenditure, to whom paid, and the check number could be entered, and the amount of the expenditure could then be entered in the column indicated for that category of expenditures. There were columns headed "Caskets and Vaults," "Salaries," "Auto Expense," "Materials and Supplies," "Cemeteries," "Florists," "Utilities," "Wages," etc. No salaries were paid by the business so Harry entered in the column for salary expense the expenditures which he considered personal rather than business. The total of the "salary" columns for each year reconciled closely with the adjusted gross income for the business reported by Harry on his tax returns for the years 1949-54. The deposits in the checking account and receipts recorded in the Rex journals did not include all of the receipts reflected in the first-call booklets and on the funeral record cards. In some instances no receipts were recorded in the Rex journal from funeral receipts which were recorded in the first-call booklets and/or *15 the funeral record cards; in other instances only a part of the receipts recorded in the booklets and cards was entered in the Rex journal. These omissions and understatements were quite numerous. Statements of account, marked "Paid in Full" by Harry, were received in evidence which reflected charges made that were not recorded in the Rex journals. In some instances the Rex journal contained entries indicating receipt of income which did not appear on either the booklets or the cards. In some instances receipts would be recorded in the booklets which were not recorded on the cards and vice versa. Many of the expenditures recorded in the Rex journals and deducted as business expenses on the returns for the years 1949-54 represent payments made to various department stores and retail stores in Colorado Springs, including drugstores, to hotels and clubs in the area, and to doctors and hospitals. Some of these expenditures were for personal clothing, jewelry, household goods, liquor, cigarettes, cosmetics, and other merchandise. Many of these expenditures were not accurately characterized on the Rex journals or the returns. For example, expenditures for medical expenses were deducted *16 on the returns as "Merchandise bought for manufacture or sale," as were payments for repairs to the plumbing in the building. Expenditures for charitable contributions and for entertainment of personal and political friends were recorded in the Rex journal under the heading "Advertising" and were so deducted on the returns. Harry claimed the standard deduction, in lieu of itemized deductions, on his returns for the years 1949-54. Some expenses properly attributable to the Blunt Mortuary business during the years 1949-54 were paid in cash and were not deducted as business expenses on the returns filed by Harry. Harry was the only person authorized to sign checks on the Blunt Mortuary bank accounts so if Harry was not available to sign a check for freight or c.o.d. deliveries of materials and supplies purchased for use in the business, these charges were paid for out of cash receipts that had not been deposited in the bank. Honorariums paid to clergymen and organists participating in funerals were usually paid in cash, as were payments made to people hired to drive automobiles at funerals and some odd-job employees Nonbusiness personal expenditures were also often paid with cash taken *17 from undeposited business receipts. At times when checks were received in payment of funeral charges, the excess of the face amount of the check over the payment due on the account might be paid out of cash receipts. None of these cash expenditures were recorded in the Rex journals; likewise none of the cash receipts so expended was deposited in the bank or recorded as income in the Rex journals. Amounts received as "prearrangements," that is, payments made for funerals in advance of the death of the deceased, were usually deposited in the special savings account. Harry also deposited other business receipts in this account to reimburse the account for expenditures made for equipment, principally automobiles, the cost of which Harry expensed on his returns for the years in which the equipment was purchased. While there were some transfers of funds from this savings account to the checking account, most of the deposits in the savings account were not recorded as income in the Rex journal or included in gross income on the returns for 1949-54. Harry was mayor of Colorado Springs from 1951 to 1957, during which time the Air Force Academy and other military installations were located *18 in Colorado Springs or nearby. Harry spent a considerable portion of his time performing his functions as mayor and did a good bit of entertaining of military personnel and political friends and supporters at his own expense. Harry also traveled to various places in his capacity as mayor, attending mayors' conventions, traffic control meetings, meetings with military personnel, inspecting work on sites being built for the municipally owned public utilities, etc. Anne often traveled with him. Harry received no compensation as mayor or councilman and was reimbursed by the City and/or the Department of Public Utilities for his travel expenses only. Harry was ill on several occasions during the period here involved and his general health was not too good. He was in the Mayo Clinic in 1949 and again, for an operation, in 1954. He was also in a hospital in Colorado Springs for about 10 days in 1952. Respondent's agents began checking Harry's income tax returns in April or May of 1955. On February 6, 1959, a Federal grand jury at Denver, Colo., returned an indictment against Harry which charged him with willfully and knowingly attempting to defeat and evade income tax owing by him for *19 the year 1952 in violation of section 145(b) of the Internal Revenue Code of 1939. On February 20, 1959, Harry entered a plea of not guilty to the charge, but on July 12, 1960, Harry changed his plea from not guilty to nolo contendere, and the changed plea was accepted by the U.S. District Court for the District of Colorado. On August 26, 1960, the District Court sentenced Harry to 2 years' probation and fined him $5,000. Issue 1 Ownership of the Mortuary Business Opinion For the first time in an amended petition filed at the time this case was called for trial petitioners claimed that respondent erred in taxing all of the income from the mortuary business to Harry for the years 1949-54, and alleged that the net income of the business is properly taxable to Harry, Evelyn, and Anne on the basis of the respective portions thereof received by each. This allegation is completely without foundation and, we believe, was tossed into the pot, so to speak, as an afterthought. We decide this issue for respondent. There is no evidence to support petitioners' contention; instead it negates that contention. Harry testified that he shared the business with his father until the time of his *20 father's death. The inheritance tax receipt on file in Colorado, for what little weight can be given to it in this proceeding, indicates that Harry's father owned one-half of the business at the time of his death, with Harry owning the other one-half, and that Harry inherited the father's one-half. Harry prepared and filed his own tax returns for the years 1949-54 purportedly reporting thereon all of the income of the business; and the certified public accountant who prepared petitioners' returns for 1955-59, reported all of the income of the business on the joint return filed for petitioners. He testified that he had never been given any reason to believe that the business belonged to anyone except Harry. Harry also filed other State and Federal returns showing himself as sole owner of the business. Both Evelyn and Anne testified that the entire business belonged to Harry - Harry did not testify that it did not belong to him. Petitioners argue that because the mortuary building and lot were owned jointly by Harry, Evelyn, and Nellie until Nellie's death and then by Harry and Evelyn and no rent was paid by Harry for use of the property; that because Evelyn and Anne at times assisted *21 Harry in the conduct of the business and received no compensation therefor; and that because Evelyn and Anne had some of their personal expenses paid out of the receipts of the business, either Evelyn and Anne should be taxed on a part of the income from the business or Harry should be entitled to deduct the amounts received by them. Whether Harry would have been entitled to deduct reasonable compensation and rent actually paid to Evelyn and Anne is not the issue; Harry would still be liable, as the owner of the business, for tax on all of the correct taxable income of the business. Furthermore, there is no evidence that Harry paid either Evelyn or Anne anything for compensation and rent as such. Issue 2 Omissions and Understatements of Gross Receipts for the Years 1949 through 1955 Additional Findings of Fact As heretofore found, Harry reported as gross receipts of the business on his tax returns for the years 1949 through 1954 only the gross receipts deposited in the checking account and recorded in the Rex journal, and those amounts did not include all of the receipts reflected on the first-call booklets and/or the funeral record cards. Harry reported on his returns gross *22 receipts for the years and in the amounts shown below. In his notice of deficiency respondent determined that petitioners had understated gross receipts for each of those years in the amounts shown below. Respondent's determination of understatements of gross receipts was based on a comparison of the gross receipts reflected in the Rex journals and reported on the returns with the gross receipts reflected on the funeral record cards, with the addition of one or two additional items. On brief, respondent avers that, due to certain adjustments, an analysis of the funeral record cards and an item-by-item comparison with the gross receipts recorded in the Rex journal now shows an understatement of gross receipts in the amounts shown below: Understatement of
Understatement of
Gross receipts
gross receipts per
gross receipts per Year
per return
notice of deficiency
respondent's brief
1949
$30,201.89
$14,225.45
$13,748.14
1950
29,000.91
10,363.05
8,682.05
1951
37,370.39
7,086.74
7,086.74
1952
38,597.56
14,296.93
14,296.93
1953
33,063.78
5,172.75
5,172.75
1954
39,694.03
6,286.94
6,286.94
We find that Harry understated gross receipts *23 of the business on his returns for each of the years 1949 through 1954 in the amounts now determined by respondent, being $13,748.14 for 1949, $8,682.05 for 1950, $7,086.74 for 1951, $14,296.93 for 1952, $5,172.75 for 1953, and $6,286.94 for 1954. Respondent determined in the notice of deficiency that petitioners had understated gross receipts from the business for the year 1955 in the amount of $748.99. No evidence was presented to show error in this determination. We find that petitioners understated gross receipts from the business for the year 1955 in the amount of $748.99. Opinion There can be no question that the gross receipts of the business were understated on Harry's returns for each of the years 1949 through 1954. The more difficult task is to determine by how much they were understated. Harry reported as gross receipts only those amounts deposited in the business checking account. It is obvious from the record that not all of the gross receipts of the business reached the checking account. It is admitted by petitioners that some of the cash receipts were used to pay business expenses and consequently were not deposited in the bank. It is also admitted that certain *24 business receipts were deposited in the special savings account and that a large part of these receipts were never transferred to the checking account. It is at least tacitly admitted by Harry in his testimony that some of their personal living expenses were paid for with cash taken from business receipts before they could be deposited in the bank. We think it is quite apparent from the record as a whole that petitioners and their son, and Harry's mother while she was living, and probably Evelyn too to some extent, were "living out of the business." Respondent determined the amount of gross receipts understated by comparing by items the receipts reflected in the funeral record cards with the receipts recorded in the Rex journal. This resulted in a substantial understatement of gross receipts in each of the years 1949-54 as shown in our findings of fact. In addition to the amounts deduced from such a comparison, respondent also made an analysis of the number of transactions which were reflected on the funeral record cards and the number of such transactions in which the receipts were reported correctly, or were omitted entirely, or were understated in the Rex journal as compared with *25 the cards. A summary of that analysis is as follows: Total number
Reported
Reported but Year
of collections
correctly
Omitted [1]
understated
1949
153
74
53
26
1950
132
70
45
17
1951
156
102
43
11
1952
215
127
72
16
1953
168
106
55
7
1954
175
112
58
5
Petitioners argue that the funeral record cards were made up by high school girls employed by Harry at some time after the transactions occurred only for the purpose of having a record of funerals conducted filed in alphabetical order, and that the funeral record cards were not records kept in the ordinary course of petitioners' business and are not admissible in evidence and respondent was in error in relying on them. While Harry testified that the cards were not completed at the time the transactions occurred, an examination of the cards themselves indicates that while the initial information was typed onto the cards, subsequent entries of payments *26 made were written on the cards by hand, which suggests that these entries were made at or near the time the payments were received. Furthermore, we think the cards were a part of the permanent records of the business kept in the regular course thereof and that respondent was entitled to rely on them as much as petitioners were entitled to rely on the Rex journals, in which the entries were admittedly made by Harry sometime after the transactions occurred. In addition we have painstakingly made a comparison, on an item-by-item basis, of the gross receipts shown in the first-call booklets, which Harry allegedly used in making up the Rex journals, with the gross receipts shown in the funeral record cards, and with the gross receipts shown in the Rex journals. This analysis reveals that in almost every instance the gross receipts recorded in the first-call booklets were also recorded in the funeral record cards, but on isolated occasions the cards reflected receipts that were not shown in the booklets. The reason for this might be explained by the following example. Bessie Agnes Cline died on June 7, 1951. The total charges for the funeral reflected in both the first-call booklet and *27 on the funeral record card were $471.65. The booklet shows payments of $52.50 on June 12, 1951, $100 on July 28, 1951, $19.15 on September 18, 1952, and then makes reference to the card for further payments. The card shows the above payments, and in addition shows payments of from $10 to $25 per month over several years until the account was paid in full. Thus the cards might be more complete than the booklets made up when the transaction took place. Also, when we compare the total receipts shown on the first-call booklets, on an annual basis, with the receipts recorded in the Rex journals, the omissions and understatements in the Rex journals are not much different than those determined by respondent by comparing the cards with the Rex journals. For purposes of determining the amounts of the deficiencies, respondent's determinations are presumed to be correct and the burden of proof is on petitioners to show wherein they are wrong, unless it is shown that respondent's determination was arbitrary or unreasonable. Petitioners have failed to prove that respondent's determination was either *28 arbitrary or unreasonable. No more accurate way for determining gross receipts has been suggested. The entries showing receipts in the booklets and cards were not made up out of thin air. No plausible explanation has been given why Harry did not pick up all of the gross receipts shown on the original entry records and enter them in the Rex journal if he really intended that the Rex journal should correctly reflect the gross receipts of the business. We have therefore found that Harry omitted from gross receipts reported on his returns for each of the years 1949 through 1955 the amounts determined by respondent in his notices of deficiency, with the downward adjustments for 1949 and 1950 he now agrees should be made. [1]
*29 Issue 3 Deductions For Business Expenses Paid By Check Additional Findings of Fact All checks drawn on the Blunt Mortuary checking account were recorded on the expenditures pages of the Rex journals for the years 1949 through 1954. The date of the check, the payee, the check number, and the face amount were entered on the left-hand side of the page and the amount of the check was then entered under one of the expenditures columns mentioned in our general findings of fact. One of the expenditures columns was headed "Salaries." The amounts entered in this column were considered by Harry to be personal expenditures and were not deducted as business expense on the returns prepared by Harry. The total face amount of the checks recorded for 1949 was $30,165.38 of which the amount of $2,870.66 was entered in the salaries column; for 1950 the totals of the two columns were $28,760.64 and $2,649.37, respectively; for 1951 they were $37,299.69 and $2,966.31; for 1952 they were $38,391.39 and $3,312.39; for 1953 they were $33,012.76 and $3,327.42; and for 1954 they were $39,445.15 and $3,875.40. All of the amounts entered in all expenditures columns except the salary column were treated *30 by Harry as business expenses and deducted as such on the returns. Many of the checks were payable to various department stores and clothing stores in Colorado Springs and Denver, to drugstores, particularly Aley Drug Co., to hotels and clubs, and to hospitals and doctors. Many of the expenditures were for personal clothing, jewelry, household goods, liquor, cigarettes, cosmetics, and other merchandise. Some of them were for payment of Harry's personal hospital and medical bills. Practically all of the checks made payable to department stores, clothing stores, and drugstores were entered under the column headed "Materials and Supplies." Many of the checks made payable to hospitals and doctors were entered under the column headed "Other Expenses," while others were entered under "Caskets and Vaults." Numerous small checks made payable to railroads were also entered under "Caskets and Vaults." A large portion of the amounts entered in the salaries column was made payable to either insurance companies, Micci grocery store, or Harry. Many of the checks written to hotels and clubs were entered under a column headed "Advertising Obituaries." Families of the deceased usually furnished *31 the clothing to be used for burial. However, on occasions it was necessary for the mortuary to furnish the clothing in which the deceased was to be buried. These garments were usually obtained through mortuary supply houses although at times items of clothing and other supplies used in the business (such as cosmetics and tissue paper) were purchased in local retail stores. According to the mortuary records the following amounts were charged to customers for burial payments furnished by the mortuary: Year
Amount
1951
$196.45
1952
238.35
1953
145.00
1954
213.16
As previously mentioned, Harry was active in political and civic affairs and on occasions he would entertain individuals in connection with these activities. Harry believed that the expenditures made for this purpose was a matter of establishing good public relations, and he also thought it was good business for him to maintain contacts with doctors, ministers, and businessmen. The following schedule reflects the amounts of various business expenses claimed on petitioners' returns for the years 1949 through 1959, and the extent to which the deductions claimed were disallowed by respondent in his notice *32 of deficiency: Deduction claimed
Amount disallowed
per return
by respondent
1949
Materials and supplies
$ 3,101.51
$1,809.91
Advertising
1,341.95
389.12
Auto expense and repairs
1,515.04
182.20
Utilities, telephone, taxes
1,149.88
400.00
Other expense
267.07
1950
Material and supplies
$ 3,256.29
$2,354.39
Auto expense and repairs
1,808.43
815.81
Advertising
1,610.21
835.03
Utilities, telephone, taxes
1,495.08
400.00
Other expenses: Colorado Hospital -
Service
$30.00
Alta V. Smith
59.57
89.57
1951
Merchandise bought for sale
$11,280.70
$ 111.53
Material and supplies
3,922.28
2,885.96
Auto expense and repairs
2,873.54
1,988.41
Advertising
2,052.01
1,040.55
Utilities and telephone
1,497.63
180.00
Taxes
1,606.77
250.00
Repairs to building
2,082.48
1,546.36
Other expense (change made by checks, etc.)
664.71
1952
Merchandise bought for sale
$14,281.35
$1,775.69
Material and supplies
3,273.33
2,598.12
Advertising
1,869.09
767.84
Utilities and telephone
1,570.30
180.00
Taxes
2,044.57
455.00
Various amounts, etc.
2,808.66
1953
Merchandise bought for sale
$ 9,115.72
$ 138.00
Material and supplies
3,470.59
2,504.37
Advertising
1,519.12
783.31
Utilities
1,549.17
180.00
Taxes
2,361.39
655.00
Building maintenance, repairs
1,796.13
1,647.49
1954
Merchandise bought for sale
$11,234.23
$1,302.76
Material and supplies
4,426.67
3,666.70
Auto expense and repairs
2,152.24
820.30
Advertising
2,868.68
2,068.02
Utilities
1,782.86
180.00
R.R. tickets and express
1,505.32
288.21
Taxes
2,463.09
250.00
1955
Supplies
$ 2,378.29
$1,889.37
Advertising
1,030.05
613.46
1956
Supplies
$ 4,438.79
$3,388.48
1957
Supplies
$ 4,184.41
$4,112.93
1958
Supplies
$ 3,045.99
[1] $3,087.91
1959
Supplies
$ 2,564.28
$1,948.64
*33 Included in the amounts disallowed by respondent were payments for repairs to furniture, for painting and decorating the interior of the mortuary, and for hauling topsoil to be used in plainting a new lawn around the building. Also disallowed were payments to hospitals and doctors for Harry's personal medical expenses, and payments made to hotels, clubs, the Aley Drug Co., and various department and clothing stores. Also disallowed was the amount of $1,317.31 claimed as a deduction for repairs paid to Whisenant Construction Co. in 1951 for repairs to the kitchen floor in the mortuary building. Ultimate Findings of Fact Of the amounts disallowed by respondent in the schedule above, the following amounts paid by check constituted ordinary and necessary expenses of the mortuary business for the years 1949-54, and are deductible as such: [2]
Deductible as
business ex- Year
penses
1949
$ 830
1950
1,200
1951
1,200
1952
2,850
1953
1,785
1954
1,290
*34 Petitioners have failed to carry their burden of proving that respondent erred in disallowing any of the amounts disallowed for supplies and advertising in the notice of deficiency for the years 1955 through 1959. Opinion The issue is whether respondent erred in disallowing any part of the deductions claimed by petitioners on their returns for the years involved as shown on the schedule above, all of which amounts were paid by petitioners by check and were recorded in the Rex journals. It is clear from the evidence that many of the disputed items were not accurately characterized in either the Rex journals or on the returns. For example, medical expenses were included in "Merchandise bought for manufacture or sale" on the returns, as were payments made for repairs to the plumbing in the building. It is also clear from the evidence that many of the expenditures disallowed by respondent were actually payments for items of clothing, cosmetics, drugs, cigarettes and beverages, jewelry, household goods, and other items used personally by Harry, Anne, and Evelyn, and which would be nondeductible as personal living expenses. A large part of the expenditures disallowed was for payments *35 made to hotels and clubs, and for liquor and food, claimed by Harry to have been spent for entertaining not only business contacts but also in his capacity as mayor of Colorado Springs. The chief problem is that practically no evidence, other than the self-serving testimony of Harry that they were all expenditures for either business or civic purposes, was offered to support petitioners' claim. The burden of proof on these items was on petitioners and they must offer competent and convincing evidence to show that the expenditures were deductible. We are not convinced by much of the testimony of Harry and Anne with respect to these items because it was not only self-serving, but was in the form of flat conclusory statements with nothing to support the conclusion. Furthermore, Harry's testimony was at times contradictory and he admitted, when confronted with specific items, that he made mistakes in classifying the expenditures. Petitioners have agreed by stipulation that some of the items were properly disallowed. On the other hand there are some instances where the evidence is relatively clear that petitioners are entitled to a deduction. For example, payments for mortuary supplies, *36 cosmetics and clothing purchased for use in the mortuary business, and allocated repairs to the mortuary building, are obviously ordinary and necessary business expenses. To the extent that the record permits a finding as to the nature and amount of a particular item that can be so classified, a deduction has been allowed. Entertainment expenses are deductible only if they are in fact ordinary and necessary expenses of carrying on a trade or business and, to the extent that they are primarily social and personal in nature and bear no direct relation to the operation of a business, such expenditures may not be deducted. James Schulz, 16 T.C. 401. There certainly is little evidence that justifies allowing many of the entertainment expenses claimed as ordinary and necessary expenses of the mortuary business.[3] On the other hand, we recognize that due to the nature of the business and the fact that Harry was living at the mortuary during the years 1949 through 1954 it was probably necessary and important to the business that Harry maintain some social contact with people from whom *37 the mortuary derived business. Applying the rule of Cohan v. Commissioner, 39 F. 2d 540, after carefully considering all of the evidence, we have used our best judgment to make an approximation of the amounts of these expenditures which were disallowed by respondent which we believe were related to and were ordinary and necessary business expenses of the mortuary business, and have determined that the amounts set out in our ultimate findings of fact above, are deductible by petitioners as such. The additional amounts allowed include some expenditures paid by check for use and repairs for automobiles used in the business, for repairs and upkeep of the mortuary building and furnishings, for materials and supplies used in the business, for business entertainment and advertising, for clothing purchased for use in the business, and for other items that appear to have been ordinary and necessary expenses of the business. Needless to say the additional amounts allowed may be high or low but with so many individual items to consider it would be almost impossible to *38 be accurate. Issue 4 Additional Business Expenses Paid By Cash Additional Findings of Fact In addition to the business expenses paid by check, in each of the years 1949 through 1954 Harry incurred and paid some deductible business expenses in cash, such as payments to ministers, singers, organ players, and altar boys, and for freight bills, all in connection with the mortuary business, and Harry did not claim any deduction for these cash payments on the returns filed for those years respectively. In addition, some materials and supplies used in the business were occasionally purchased from local retail stores for cash. Most of the cash payments were made out of cash on hand, and usually no record of the payment was made. During the years 1949 through 1954, ministers who officiated at funerals conducted by the Blunt Mortuary frequently were paid an honorarium by Harry in currency. This honorarium was usually in the amount of $5. On many occasions no honorarium was paid because the funeral involved an indigent, or was a nominal-cost funeral as in the case of an infant, or the family of the deceased paid the minister directly. Many of the cases handled by the Blunt Mortuary did *39 not involve a service conducted by a minister. For example, in 1952 there were 23 "ship-outs" (a "ship-out" being where the funeral service was not rendered by the Blunt Mortuary); in 1953 there were 18 "ship-outs," and in 1954 there were also 18. Evelyn customarily played the organ at funeral services conducted by the Blunt Mortuary. She received no compensation for her services. On the few occasions when she was not present, another organist would be paid in currency. Harry customarily did the singing at the funeral services. Occasionally another singer was employed. Freight bills of the Blunt Mortuary occasionally were paid by currency. No record was kept of the amount of these payments, and they usually were made by currency only when Harry was not available to write a check. Expenditures for freight that were made by check in each of the years involved have been allowed as deductions by respondent. Harry had a working arrangement with the Nolan Funeral Home in Colorado Springs for the exchange of limousines and drivers when the need arose. This arrangement did not involve any exchange of payments but was entirely an exchange of services. Because of this arrangement, during *40 the years 1949 through 1959 the Blunt Mortuary only occasionally relied on extra drivers or limousines. In the notice of deficiency, respondent allowed Harry additional deductions for all of these items as follows: Amounts allowed Year
by respondent
1949
$320.38
1950
379.65
1951
300.00
1952
499.00
1953
380.50
1954
351.00
Opinion The question presented is whether Harry is entitled to deduct as ordinary and necessary business expenses alleged cash payments in an amount greater than that allowed by respondent in the notice of deficiency. Respondent agrees that if the amount of these alleged payments is established, they would constitute ordinary and necessary business expenses deductible under section 162. The question of how much was actually spent is the only problem remaining. We believe it is clear that certain cash payments were made, and no deduction was claimed. However, in the notice of deficiency respondent allowed an amount varying between $300 and $499 for each year involved. There was no specific proof as to any cash expenditures in excess of the amount allowed by respondent. We have carefully reviewed all the exhibits and testimony, *41 and have concluded that Harry has not established that he is entitled to deduct an amount greater than that allowed by respondent. Before an approximation is to be made under the rule of Cohan v. Commissioner, supra, it must be clear from the evidence that the amounts allowed by respondent were insufficient, and there must be some basis in the evidence from which an allocation can be made. See Charles H. Hyslope, 21 T.C. 131 (1953). Harry has failed to carry his burden of proof on this issue, and we sustain respondent's determination. Issue 5 Depreciation Deductions Additional Findings of Fact Harry did not claim any deductions for depreciation on his returns for the years 1949 through 1954. The parties have stipulated that Harry is entitled to deductions for depreciation in the years 1949 through 1954 on automobiles, funeral coaches, the mortuary building, and hearse equipment. In the notice of deficiency issued to Harry, respondent allowed deductions for depreciation on those items, as follows: Depreciation allowed Year
by respondent
1949
$ 235.00
1950
532.92
1951
$2,050.32
1952
2,440.24
1953
2,340.24
1954
2,332.74
*42 Petitioners did not claim any deduction for depreciation on their original return for the year 1955, and they did not claim all of the deductions for depreciation to which they are entitled on their original returns for the taxable years 1956 through 1959. The parties have stipulated that petitioners are entitled to deductions for depreciation, in addition to those amounts claimed on their original returns for said years, on automobiles, funeral coaches, building, furniture and fixtures, and hearse equipment. In the notice of deficiency issued to petitioners respondent allowed deductions for depreciation for each of the years 1955 through 1959, as follows: Depreciation allowed Year
by respondent
1955
$2,351.37
1956
2,736.79
1957
2,840.31
1958
2,137.11
1959
1,813.11
In computing the amount of depreciation to be allowed petitioners, respondent determined that the following vehicles had the following salvage values and useful lives: Year
Automobile
Salvage value
Useful life
1950
"62" Cadillac
$ 500
8 years
1950
Station Wagon
500
6 years
1950
"75" 8-passenger Cadillac
500
10 years
1951
"60" Special Cadillac
2,500
34 months
1951
Funeral coach
500
10 years
1954
"60" Special Cadillac
3,000
4 years
1956
Pontiac Station Wagon
4 years
1958
Pontiac Station Wagon
400
4 years
*43 In the original returns filed by petitioners for the years 1956 through 1959, they claimed depreciation only on an automobile acquired in 1956 and on a station wagon acquired in 1958. Amended returns were apparently filed for each of the years 1955 through 1959 claiming additional depreciation but the only amended returns offered in evidence were those for the years 1955 and 1956. The depreciation schedule attached to those amended returns claimed depreciation on automobiles computed by use of the following factors, the date of acquisition and cost agreeing with the date of acquisition and cost used by respondent in computing depreciation in his notice of deficiency: Year
Automobile
Cost
Salvage value
Useful life
1950
Cadillac ("62")
$4,000.00 $400
8 years
1950
Oldsmobile Station Wagon
3,199.95
725
6 years
1950
Cadillac ("75")
5,667.04
570
8 years
1951
Cadillac funeral coach
5,173.19
250
10 years
1954
Cadillac ("60")
6,570.30
660
8 years Petitioners claimed additional depreciation on these automobiles in their amended petition. Harry, Evelyn, and Nellie each acquired a one-third interest in the land and building of the Blunt *44 Mortuary at the death of George E. Blunt on December 1, 1942, and this ownership continued until the death of Nellie on March 2, 1951. Thereafter, and through the years involved, the land and building have been owned one-half each by Evelyn and Harry. In determining depreciation on the building, respondent based his computation upon the Colorado inheritance tax value at the time of the death of George E. Blunt. This value was $15,000 for the land, building, and all improvements. The inheritance tax value was reduced by respondent by the following amounts: Land
$1,000
Household furniture and fixtures
1,000
Business furniture and fixtures
1,000
Respondent also reduced the value of the building by an additional $3,000, on the basis that 25 percent of the building was devoted to use as a personal residence. Thus the adjusted basis for the building, as computed by respondent, was $9,000, and Harry was allowed depreciation deductions on one-half of that amount. The building was determined to have a useful life of 33 1/3 years. In his notices of deficiency respondent allowed depreciation for the years 1949-54 on furniture and fixtures and hearse equipment having *45 a total cost of $1,522.90, no salvage value, and a life of 10 years; and added various items to the schedule for subsequent acquisitions. In the depreciation schedules attached to petitioners' amended returns for the years 1955 and 1956 they claimed depreciation on the mortuary building using a cost basis of $25,000, no salvage value, and a 50-year life from 1938. They also claimed depreciation on furniture and fixtures having a cost basis in 1938 of $7,500 and a life of 10 years. By amended petitions petitioners claim additional depreciation on these items, using a stepped-up basis for depreciation. Ultimate Findings of Fact For purposes of depreciation the automobiles used by the Blunt Mortuary were acquired and disposed of on the dates determined by respondent in his notices of deficiency, had cost basis in the amounts determined by respondent, and had salvage values and useful lives as follows: Year
Automobile
Salvage value
Useful life
1950
"62" Cadillac
$ 500
6 years
1950
Oldsmobile Station Wagon
500
6 years
1950
Cadillac ("75")
500
8 years
1951
Cadillac Funeral Coach
500
8 years
1951
Cadillac ("60")
800
6 years
1954
Cadillac ("60")
1,000
6 years
1956
Pontiac Station Wagon
500
4 years
1958
Pontiac Station Wagon
500
4 years
*46 The Blunt Mortuary building had a fair market value of $45,000 in 1942, and also had a fair market value of $45,000 in 1951 at the time of death of Harry's mother. It had a 33 1/3-year life as of 1942 and had no salvage value. The furniture and fixtures used by the Blunt Mortuary during the years here involved had a basis for depreciation and useful life as determined by respondent in his notices of deficiency. Opinion The Internal Revenue Code provides that a reasonable allowance for the exhaustion, wear, and tear of property used in the trade or business shall be allowed as a depreciation deduction. Sec. 167(a). Generally speaking the allowance is that amount which should be set aside for the taxable year in accordance with a reasonably consistent plan, so that the aggregate of the amount set aside, plus the salvage value will, at the end of the estimated useful life of the depreciable property, equal the cost or other basis for the property. The estimated useful life of an asset is not necessarily the useful life inherent in the asset but is a period over which the asset may reasonably *47 be expected to be useful to the taxpayer in his trade or business. The estimated useful life may be subject to modification by reason of conditions existing at the end of the taxable year but should be redetermined only when the change in the useful life is significant and there is a fair and reasonable basis for the redetermination. Salvage value is the amount, determined at the time of acquisition, which is estimated will be realizable on sale or other disposition of the asset when it is no longer useful in the taxpayer's trade or business and is to be retired from service by the taxpayer. Salvage value may not be redetermined merely because of changes in price levels. See sec. 1.167(a)-1, Income Tax Regs.
Petitioners did not claim all of the deductions for depreciation to which they are entitled on the returns for the years in question, and respondent agrees that deductions for depreciation are proper. The dispute between the parties centers around three principal areas: (1) The salvage value of the vehicles used in the mortuary business; (2) the useful lives of those vehicles; and (3) the fair market value of the mortuary building at the time Harry *48 acquired his interest therein. The questions presented under this issue are all essentially factual determinations, and they are controlled by our ultimate findings of fact. Respondent's determinations are presumed to be correct and the burden is on petitioners to prove wherein they are in error. Respondent determined the useful lives of the vehicles used in the mortuary business somewhat from the actual experience of petitioners with those vehicles prior to and up to the time respondent made his determinations. While this method of determining the useful life of a depreciable asset may have the virtue of hindsight and might be used to modify the useful lives for the future, the estimated useful life of a depreciable asset should be determined as of the date of acquisition. Petitioners offered the testimony of an individual who had been in the automobile business for some time in Denver who was generally familiar with the vehicles used in mortuary businesses and whose qualifications to testify respondent did not question. This witness testified that normally vehicles of the type used by the Blunt Mortuary would be expected to have useful lives of 4 years, except that the larger *49 Cadillac coach ("75") and the Cadillac funeral coach could be expected to have normal useful lives of 6 years. This testimony, however, was based only on the witness' general knowledge of vehicles used in the mortuary business and on the assumption that it was important for mortuaries to use current model vehicles that appeared to be in good condition. However, this witness was not at all familiar with the use to which the Blunt Mortuary put its vehicles, its practice with respect to trading vehicles for new ones, nor its repair policies. The evidence before us indicates that the Blunt Mortuary normally kept its vehicles in use for periods longer than the ordinary. Consequently, we have used our best judgment to determine the estimated useful lives of the vehicles in question as set forth in our ultimate findings of fact. Petitioners' witness also testified that the salvage values of the 1951 and 1954 Cadillac Specials ("60") would be $800 and $1,000, respectively. We have accepted that evidence in arriving at our determinations of the salvage value and have accepted respondent's determinations with respect to the other vehicles. In allowing depreciation deductions for the mortuary *50 building respondent determined that the basis for depreciation should be the fair market value of the property as indicated in a Colorado State inheritance tax form filed after the death of George E. Blunt in 1942. Petitioners offered the testimony and appraisal report of a qualified real estate appraiser from Colorado Springs who had examined the property and gave his opinion that the fair market value of the mortuary building as of 1942 was $45,000 and the fair market value of the property was likewise $45,000 in 1951. This opinion was based on the cost of replacing the building as of each of the critical dates adjusted for depreciation where warranted. Replacement cost was used by the witness because the building was a special purpose building and there was no possibility of substitution from the market. The witness testified that while the cost of replacing the property had increased from the time it was built in approximately 1936 until 1942 and the building might have suffered some wear and tear during that period, he did not think the custom in the real estate appraisal business at that time was not to adjust the replacement cost for depreciation because of the lack of labor *51 and materials to construct nondefense buildings during wartime. He testified further that the cost of replacing the mortuary building had risen by 1951 to about $57,000 but that a willing purchaser would discount this cost by wear and tear experienced in the interim in an amount approximately equal to the increase in cost of replacing the property, so that his estimate of the fair market value of the mortuary building in 1951 was the same $45,000 as he estimated the fair market value to be in 1942. Respondent offered no evidence to rebut the testimony of petitioners' expert, and inasmuch as we think his approach was reasonable we have accepted his estimates of the fair market value of the mortuary building on the two critical dates. A portion of the mortuary building was clearly used as a personal residence, and the evidence indicates that this personal use would approximate 25 percent of the entire building. Therefore in computing the allowable depreciation under the Rule 50 computations, the fair market value should first be reduced by 25 percent to allow for this personal use of the building. Harry acquired a one-third interest in the building when his father died and acquired *52 an additional one-sixth interest when his mother died in 1951. Therefore Harry is entitled to deduct one-third of the allowable depreciation on the building for the period 1949 to the date of his mother's death in 1951, and thereafter one-half for the remainder of the years in question. Harry's argument that he is entitled to the entire depreciation deduction is without merit. Evelyn clearly owned a part interest in the building and we have been shown nothing which would entitle Harry to any depreciation with respect to her interest. We have accepted respondent's determination of the useful life of the building. Petitioners argue that they are entitled to additional depreciation for the furniture and fixtures used in the mortuary business. However, petitioners have not demonstrated any error in respondent's determination with respect to these items and we believe respondent has adequately provided for these items in determining the deficiencies for the years in issue. There is no competent evidence in the record to support petitioners' claim that the cost basis of the 1951 funeral coach should be increased to reflect the value of another vehicle which was allegedly traded in at the *53 time of the purchase nor their argument that they are entitled to additional depreciation on a Cadillac which they allegedly acquired in 1949. Issue 6 Right to Itemize Deductions for the Years 1949 through 1954 Additional Findings of Fact On his returns filed for the years 1949 through 1954 Harry computed his tax liability from the tax table, thereby utilizing the standard deduction in lieu of itemizing the various deductions he may have been entitled to. In their joint returns filed for the years 1955 and 1956 Harry and Anne claimed the standard deduction in lieu of itemizing their deductions. By amended petitions filed on November 15, 1965, petitioners for the first time elected to claim itemized deductions for the above years. In the notices of deficiency respondent allowed the standard deduction for the years 1949 through 1956. Opinion The issue is whether petitioners may now elect to claim itemized deductions in lieu of the standard deduction, where they initially computed their tax liability on the returns filed by a method which is based on the standard deduction. Respondent concedes that for all years after 1949 petitioners may change their election, because the *54 law in effect for those years specifically permits such a change after the return is filed. See sec. 23(aa)(7), I.R.C. 1939, as amended by section 308(a) and (b) of the Revenue Act of 1951 (effective for taxable years beginning after December 31, 1949), and sec. 144(b), I.R.C. 1954. The question remaining for decision, then, is whether Harry's computation of his tax liability from the tax table for the year 1949 was an irrevocable election. The law in effect for the year 1949 provided that an election to take the standard deduction (which Harry elected to do by computing his tax from the table) was irrevocable, sec. 23(aa)(3)(C), I.R.C. 1939, [4] prior to its amendment by the Revenue Act of 1951, supra; and once made the election cannot be changed. Robert V. Johnston, 25 T.C. 106 (1955). As to the year 1949, we sustain respondent's determination that Harry may not now elect to itemize his deductions and that the standard deduction is proper for that year; and for the years 1950 through 1956 petitioner may now change their elections and itemize deductions for those years. *55 Issue 7 Allowable Deductions for Property Taxes and Utilities Additional Findings of Fact On the returns filed for the years 1949 through 1959 petitioners deducted expenditures for real estate taxes and utilities with respect to the mortuary property as business expense. In his notices of deficiency respondent disallowed a portion of the deductions claimed for utilities for each of the years 1949 through 1954 and also disallowed a portion of the deductions claimed for property taxes for each of the years 1951 through 1954. Respondent did not disallow the deductions claimed for taxes and utilities for the years 1955 through 1959. The following table reflects the amount paid for utilities, the amount paid for taxes, and the amounts disallowed by respondent in each of those categories for the following years respectively: Amount dis-
allowed by
Utilities
Taxes
respond- Year
paid
paid
ent
1949
$423.59
$844.47 $400
1950
437.54
893.10
400
1951
439.92
921.20
430 [1]
1952
477.05
900.00
430 [1]
1953
588.58
815.53
430 [1]
1954
536.97 [2]
905.53
430 [1]
*56 Opinion Respondent disallowed a portion of the real estate taxes and utilities paid by Harry with respect to the mortuary property for the years 1949 through 1954 because during those years Harry occupied a part of the building as his personal residence. We agree with respondent that some of the amounts paid by Harry for utilities and taxes are not deductible as a business expense because they are not attributable to property used in the trade or business and are more in the nature of personal living expenses. We find no reason to disagree with respondent's allocation and sustain respondent with respect to the amounts disallowed as deductions for utilities, except for the year 1954. During the year 1954 Harry paid $536.97 for utilities in the mortuary building. In the return for that year Harry excluded one-fourth of that amount (i.e., $134.24) and claimed the amount of $402.73 as a deduction. Respondent disallowed an additional amount of $180. It is clear that the claimed deduction for $402.73 was properly computed and we reject respondent's determination that an additional $180 should be disallowed. Except for the $180 in 1954, the disallowed portion of the amounts paid for *57 utilities is nondeductible as a personal living expense. With respect to the amounts disallowed as real estate taxes paid by Harry, we also sustain respondent with respect to the allocation made in the notices of deficiency. However, we conclude that the disallowed portion of the real estate taxes is deductible by Harry as an itemized deduction for the years 1951 through 1954. We realize that Harry owned only one-half of the mortuary property after his mother's death in 1951 and, technically at least, was liable for only one-half of the property taxes. On the other hand, Harry and his business occupied the premises and paid no rent to Evelyn, the owner of the other one-half interest. We think it is clear that Harry was permitted to occupy the property rent free with the understanding that he would pay all taxes and other expense incurred in connection with the property. We therefore conclude that the taxes paid by Harry that might relate to the interest in the real estate held by Evelyn must be considered rent paid by Harry to Evelyn for the use of her interest in the property and it is deductible by Harry as a business expense. Issue 8 Itemized Deductions Allowable for Medical *58 Expenses, Contributions, and Other Deductions Additional Findings of Fact During some of the years in question Harry was in poor health, and it was necessary for him to receive medical treatment at hospitals and to consult with numerous doctors. Harry underwent an operation in the year 1952 and was treated at the Mayo Clinic in Rochester, Minn., in 1954. Harry incurred and paid the following medical expenses for the years indicated: Year
Amount
1950
$ 188.00
1951
259.78
1952
2,428.32
1953
358.00
1954
1,579.75 Petitioners computed their taxes for the years 1950 through 1956 by the use of the standard deduction and claimed no deduction for medical expenses on their returns. In his notices of deficiency respondent allowed the standard deduction for each of the years 1950 through 1956, thus allowing no deduction for medical expenses. Harry occasionally contributed to the First Congregational Church, the Community Chest, and other charities in the years in question. The following table reflects the charitable contributions made by Harry as personal expenses in the respective years 1950 through 1954: Year
Amount
1950
$250
1951
275
1952
180
1953
135
1954
100
*59 On the returns for the years 1950 through 1954 Harry claimed the above and other amounts paid to charitable organizations as business expense. In his notices of deficiency respondent disallowed the above expenditures as business expense and did not allow them as itemized deductions. On their return for 1959 petitioners claimed a deduction for interest paid to Westmoor Park Co. in the amount of $2,100. This payment related to real estate in Colorado Springs, including a house and several vacant lots which at one time were owned by petitioners. The parcel involved consisted of approximately four or five acres and was to be developed by the Westmoor Park Co. A mortgage was placed on the property by the developer, and ultimately the property was developed. A deduction for interest was disallowed by respondent in the notices of deficiency issued to petitioners, with the explanation that the payment constituted "non-deductible, personal rent expense." When Harry was indicted for criminal tax evasion in 1959 he retained an attorney, David Morris, to represent him in the criminal proceedings. The criminal prosecution was pending through the year 1959 and until August 26, 1960, when *60 Harry was sentenced after entering a plea of nolo contendere. Legal fees were paid to Morris for his representation, some of the payments having been made by check and other payments being made in currency. Petitioners claimed no deduction for legal expenses on their return for the year 1959. Opinion The questions presented are essentially matters for factual determination and the burden of proof is on petitioners. With respect to some of the items, the stipulation of facts lists numerous checks that the parties agree were paid on the date, in the amount, and to the payee indicated therein. The only question remaining with respect to these items is whether they are deductible, assuming Harry elects to itemize the deductions in lieu of computing his tax liability on the basis of a standard deduction. Harry was not in good health throughout several of the years in question and he paid numerous doctors' bills, hospital bills, and other medical expenses, the amounts of which for the years 1950 through 1954 we have set out in our findings of fact. Harry is entitled to deduct these expenses, subject to the limitations contained in section 23(x), I.R.C. 1939, and section 213, I.R.C. *61 1954. Respondent does not dispute Harry's right to deduct the expenditures we find to have been made for this purpose provided he elects to itemize his deductions. These adjustments can be determined by the parties under the Rule 50 computations. Respondent also agrees on brief that Harry is entitled to deductions for certain charitable contributions which respondent itemized in his brief. We have made our own findings with respect to the amounts of charitable contributions made by Harry in the years 1950 through 1954 which he may deduct as itemized deductions and have set these amounts out in our findings of fact. Our decision in Issue 6 above precludes Harry from itemizing deductions for the year 1949. We have no evidence upon which we can determine the amount of medical expenses and charitable contributions which Harry would be entitled to deduct if he itemizes his deductions for the years 1955 and 1956. There is very little concrete evidence with regard to what the $2,100 claimed by petitioners as an interest expense in 1959 was paid for. In the notices of deficiency respondent states that the taxpayers sold their house and vacant lots to Westmoor Park Co. in January of 1959 *62 for $70,000, which amount taxpayers owed on the property, and that taxpayers were permitted to live in the house provided they paid 6 percent of $35,000, the value placed on the house. There is no satisfactory evidence proving petitioners were liable on the note, or that they actually owned the property at the time it was mortgaged. Rather, the evidence more clearly indicates that petitioners were required to pay rent to Westmoor Park Co. for the right to occupy the property after it was sold, and that this rent was fixed in an amount approximating a pro-rated portion of the annual cost of interest paid on the indebtedness by Westmoor Park Co. The evidence is not convincing that petitioners actually paid interest rather than rent and we sustain respondent's determination with respect to this item. It is agreed that Harry paid Morris legal fees for representing him in the criminal tax proceedings. However, there is no competent evidence of the amounts and no evidence of when such payments were made. Furthermore we cannot be certain from the record that any amounts paid to Morris during the years here involved had not already been allowed as deductions. It is also possible that the *63 legal fee paid to Morris was paid to him after conclusion of the criminal proceedings, which was subsequent to the years here involved. It seems strange that if petitioners paid Morris the sum of approximately $7,500 which they now claim was the amount paid to him in legal fees that these payments could not be identified. However, such is the state of the record and we must conclude that petitioners have failed to prove that they are entitled to a deduction for such legal fees. Harry testified vaguely that some delinquent accounts of the mortuary were turned over to attorneys from time to time for collection and that a portion of the amounts recovered by them was retained as legal fees. There is no evidence that the amount recovered was included in its entirety in gross income, and a deduction of fees for legal services rendered would only be proper if all of the amounts recovered was reported in gross income. Issue 9 Deductibility of Expenses Incurred as Mayor and City Councilman Additional Findings of Fact Harry served as city councilman for Colorado Springs from 1942 through and after 1959 and he served as mayor of Colorado Springs from 1951 to 1957. He did not receive *64 a salary in connection with either position. During the years 1949 through 1959 petitioners entertained frequently on a large scale. Many of the persons entertained were political or military friends with whom Harry had become acquainted in his position as mayor and city councilman. Harry and Anne served as the host and hostess to various visiting dignitaries, most of whom were in Colorado Springs in connection with the location and operation of the Air Force Academy there and various water and soil conservation projects that were beneficial to the City. Harry was instrumental in the effort to get the Air Force Academy located in Colorado Springs. Harry was not reimbursed for any of these expenses of entertaining. Also in connection with his duties as mayor and councilman Harry occasionally made trips to various parts of the country. He was usually reimbursed for the cost of transportation on such trips by the City of Colorado Springs and also by the independent Department of Public Utilities of the City of Colorado Springs, but he incurred other expenses incident to his duties on such trips for which he was not reimbursed. Ultimate Finding of Fact For the years 1951 to 1957 *65 Harry spent at least $600 per year while serving in his capacity as mayor. Opinion The question presented is whether Harry is entitled to deduct any expenditures he made while serving as mayor and city councilman throughout the years in question. Petitioners argue that a deduction is allowable under sections 23(o) and 120, I.R.C. 1939, and section 170, I.R.C. 1954. [5] Both parties cite and rely on Rev. Rul. 59-160, 1959-1 C.B. 59, which provides in part as follows: To the extent that mayors, councilman, and/or other elected or appointed officials, who render the services of such offices for cities or other municipal governments without compensation, can establish that they actually incurred unreimbursable expenses directly connected with and solely attributable to the performance of their official duties (i.e., are not personal expenses), the amount of such out-of-pocket expenses constitute contributions within the meaning of section 170 of the Internal Revenue Code of 1954 and are deductible in computing taxable income, subject *66 to the limitations imposed by that section. Respondent contends that petitioners have failed to prove that they spent any money for these purposes. The evidence is clear, however, that Harry did spend a large portion of his time serving as mayor, that he did entertain visiting dignitaries and military personnel at his own expense, and that he was not paid a salary or reimbursed for all of these expenses. There is little direct evidence of how much Harry spent, if any, while he served as city councilman only; therefore, for those years no deduction is allowed because petitioners have failed to carry their burden of proof. With respect to the years when Harry served officially as mayor, there is *67 some direct evidence of the expenditures, both as to amount and frequency. We have found as an ultimate fact that Harry spent at least $600 per year for the years 1951 through 1957, and petitioners are entitled to a deduction in that amount for those years as charitable contributions under section 23(o), I.R.C. 1939, and section 170, I.R.C. 1954, subject to the limitations provided therein. Cohan v. Commissioner, supra.
Issue 10 Addition to Tax Under Section 294(d)(2)
Additional Findings of Fact Petitioners' income tax return for the taxable year 1954 reflects payments on 1954 declaration of estimated tax in the amount of $208. The income tax return filed by petitioners for the year 1953 reports a tax liability for that year in the amount of $265. In the notice of deficiency issued to petitioners, respondent determined that petitioners were liable for an addition to tax for the taxable year 1954 for substantial underestimation of declaration of estimated tax under section 294(d)(2), I.R.C. 1939. Opinion In the notices of deficiency issued to Harry respondent determined that an addition to tax under section 294(d)(2), I.R.C. 1939, was *68 due for each of the years 1950 through 1954. On brief, respondent conceded the addition to tax for each of the years 1950, 1951, 1952, and 1953. The liability for addition to tax for the year 1954 therefore remains in issue. Section 294(d)(2), I.R.C. 1939, which is applicable to the year 1954, see sec. 6654(h), I.R.C. 1954, provides in material part that if 80 percent of the tax, in the case of individuals, exceeds the estimated tax, there shall be added to the tax an amount equal to such excess, or equal to 6 percent of the amount by which such tax so determined exceeds the estimated tax so increased, whichever is the lesser. Thus, if the computation under Rule 50 results in actual tax liability more than 80 percent in excess of the estimated tax, the addition will apply. Craig M. Smith, 33 T.C. 465, modified on other grounds 313 F. 2d 724 (C.A. 8, 1963); DeWitt M. Sherwood, 20 T.C. 733. Failure of petitioners to pay an estimated tax in an amount at least as great as though computed on the basis of the facts shown on the return *69 for the preceding taxable year eliminates from consideration the ameliorative provisions of section 294(d)(2), I.R.C. 1939, Craig M. Smith, supra.
Issue 11 Fraud Ultimate Findings of Fact For each of the years 1949 through 1953 at least a part of the deficiency was due to fraud with intent to evade tax and the returns filed by Harry for each of those years were false or fraudulent with intent to evade tax. For the year 1954 at least a part of the underpayment of tax required to be shown on Harry's return for that year was due to fraud and his return for 1954 was false or fraudulent with intent to evade tax. Opinion In the notices of deficiency issued to Harry for the years 1949 through 1954, respondent determined that Harry was liable for the addition to tax for fraud under section 293(b), I.R.C. 1939, [6] and section 6653(b), I.R.C. 1954. [7]The burden of proving fraud is upon respondent, and he must do so by clear and convincing evidence. M. Rea Gano, 19 B.T.A. 518 (1930). After carefully considering all of the evidence, we are convinced *70 that respondent has carried that burden. It is well established that a consistent pattern of underreporting large amounts of income, and the failure of a taxpayer to include all income received on the books and records used in the business, is evidence of fraud. Holland v. United States. 348 U.S. 121 (1954), rehearing denied 348 U.S. 932 (1955); *71 Estate of Joseph Nitto, 13 T.C. 858 (1949). In this instance the pattern of conduct is abundantly clear; the number, frequency, and amount of omitted and understated items is simply too extensive to be the result of carelessness or oversight. Harry was a well-educated man. experienced and active in business and civic affairs. The extensive details of the business recorded in the books of original entry clearly indicate that Harry had accurate information as to the amount of gross income received each year. Here the evidence is clear that Harry maintained one set of books for the conduct of business, and another set of books for income tax purposes. The evidence convincingly demonstrates that Harry deliberately omitted items of income in preparing the Rex journals. The Rex journals were used by Harry in preparing his tax returns, and since, despite the fact that the books of original entry were available to Harry and he testified that he referred to them in keeping the Rex journals, these books were incomplete and false, there is no other reasonable conclusion than that Harry knowingly omitted and deliberately understated his gross income for purposes of evading income *72 tax. In addition the evidence is convincing that Harry deliberately recorded expenditures that he must have known were unrelated to the mortuary business under various classification of business expenses in the Rex journals and then deducted the total of these expenditures as business expense. These expenditures included amounts paid to department, drug, and other retail stores for personal clothing, liquor, cosmetics and other merchandise that constituted personal living expenses, amounts paid for Harry's personal medical expenses and charitable contributions, and rather sizable amounts Harry testified were spent for entertainment. The purpose for which these expenditures were made was not indicated on the Rex journals or elsewhere in Harry's records except by the name of the payee of the check. Some of these expenditures would have been deductible if Harry had itemized his deductions, but instead he claimed the standard deduction and deducted these expenditures as business expense. We believe the claiming of such excessive and unidentified deductions in this manner is convincing evidence of fraud. There is also evidence that numerous personal living expenses and some business *73 expenses were paid out of cash receipts that were never deposited in the checking account yet Harry very meticulously prepared the Rex journals so they reflected all transactions that went through the checking account, and only those transactions, and prepared his tax returns from the Rex journals. We feel that he could not help but realize that he was not reporting all of his gross income from the business and was paying personal living expenses out of cash business income that would never be reported on the returns and would be difficult for the casual observer to discover. Harry argues that he was not an experienced bookkeeper, and that respondent has failed to prove the requisite intent to evade tax. We totally reject this contention. The evidence is clear that Harry was extremely methodical in his record keeping, and that the information necessary for preparing accurate tax returns was readily available to him. Harry also asserts that he failed to deduct many expenses and other items that more than offset the understatement and omission of income. This argument is not relevant to the determination of deliberate understatement and omission of gross income, and furthermore it *74 is not substantiated by the facts. As discussed in greater detail elsewhere in this opinion, there were some instances where Harry legally was entitled to certain deductions which he did not claim on his return, such as depreciation on the mortuary building, but these items are more than offset by the excessive, improper, and unsupported deductions that he did claim. Harry also claimed no deduction in these years for depreciation of the automobiles used in the business. However, the evidence indicates that Harry paid for these automobiles out of cash or the savings account, which was never reflected in gross income on the Rex journals, thus having the effect of deducting the entire cost of the automobiles in the year they were purchased. Harry testified that this was the reason he claimed no depreciation on the automobiles. We hold that Harry is liable for additions to tax pursuant to sections 293(b), I.R.C. 1939, and 6653(b), I.R.C. 1954, for the [years] 1949 through 1954. In his answer to amended petition respondent alleged that as result of Harry's plea of nolo contendere, and the subsequent sentencing of Harry by the U.S. District Court in the criminal *75 proceedings conducted prior to the trial of this case, Harry was "estopped to deny in this case that he knowingly and willfully and with fraudulent intent to evade tax understated his net income and Federal tax liability for the taxable year 1952." On brief, respondent does not argue this point, and therefore we deem it to have been abandoned. Issue 12 Statute of Limitations Additional Findings of Fact In the original petition filed in docket No. 392-62 and in the amended petitions filed in both docket numbers, petitioners alleged that assessment of the deficiencies for each of the years 1949 through 1954, in docket No. 392-62, and for each of the years 1955 through 1957, in docket No. 393-62, is barred by the statute of limitations, as provided in section 275(a), I.R.C. 1939, and section 6501(a), I.R.C. 1954. For each of the years 1949, 1950, 1951, 1953, and 1954 Harry executed a consent extending the statute of limitations upon assessment until June 30, 1962. For each of the years 1955, 1956, and 1957 petitioners executed a consent extending the statute of limitations upon assessment until June 30, 1962. Each of these consents was signed by petitioners *76 on March 6, 1961, and they were accepted by the Internal Revenue Service by Wilbur R. Olson, Chief, Field Audit Branch, on March 10, 1961. Wilbur R. Olson signed each consent under the typed name "V. Lee Phillips, District Director of Internal Revenue." George H. Allan held the position of district director of internal revenue, Denver, Colo., from November 22, 1954, to April 30, 1961, when he retired. From late November 1960 until April 30, 1961, Allan was physically absent from his office on sick leave and never functioned as district director of internal revenue after November 1960. V. Lee Phillips was appointed district director of internal revenue at Denver, Colo., on December 11, 1960, as an identical-additional district director of internal revenue at Denver. Pursuant to the request on November 21, 1960, of the then Commissioner of Internal Revenue Dana Latham and pursuant to the specific authorization under applicable law of the Civil Service Commission, this interim position was established for a period not to exceed August 1, 1961, pending the retirement of Allan. During substantially all of the period of the illness of Allan until the time he retired, Phillips officially *77 functioned as district director of internal revenue, denver, Colo.
On November 27, 1956, Allan signed a delegation of authority to sign consents to the incumbents of and persons acting in various positions including that of Chief, Field Audit Branch. On January 20, 1961, Phillips executed a similar delegation of authority to sign consents. Opinion Our conclusion in Issue 11 above that each of Harry's returns for the years 1949 through 1954 were false or fraudulent with intent to evade tax disposes of petitioners' contention with respect to the years 1949 through 1954. See sec. 276(a), I.R.C. 1939, and sec. 6501(c), I.R.C. 1954. In addition, our discussion below with respect to the years 1955 through 1957 would also apply to permit the assessment of deficiencies for the years 1949 through 1954. [8]
The notices of deficiency in both docket numbers were issued on November 7, 1961. Following previous consents executed by the parties extending the period within which assessments might be made for each of the years 1949 *78 through 1956, petitioners executed consents on March 6, 1961, extending the statute of limitations upon assessment of deficiencies for each of the years 1949 through 1957 until June 30, 1962, which consents were accepted by representatives of respondent on March 10, 1961. If these consents were valid, the statute of limitations does not bar assessment of deficiencies in tax for any of the years 1949 through 1957. See sec. 276(b), I.R.C. 1939, and sec. 6501(c)(4), I.R.C. 1954. But petitioners contend that the various consents executed by petitioners on March 6, 1961, were not valid because they were not accepted in behalf of the Commissioner by an officer "lawfully appointed as District Director" of the Denver District "as of the critical date of March 10, 1961." The argument by petitioners that the various consents executed by them were not properly accepted by the Commissioner and are therefore invalid and ineffective to extend the statute of limitations has been fully considered by this Court in Ben Perlmutter, 44 T.C. 382 (1965), on appeal (C.A. 10), and was there rejected in a case that involved virtually the same issue as the one presented *79 here. In fact, the parties have stipulated that all of the evidence on this issue submitted to this Court in the Perlmutter case may be considered in evidence in this case. We see no distinction between the arguments raised in Perlmutter and those presented in the instant case, and petitioners have not persuaded us that a different result should be reached here. See also Lesser v. United States, F. 2d , (C.A. 2, Nov. 9, 1966). We conclude that assessment of deficiencies for each of the years 1949 through 1957 are not barred by the statute of limitations. To permit all of the necessary computations required of the parties to arrive at a decision reflecting all of the conclusions of the Court in this opinion, Decision will be entered under Rule 50. Footnotes
1. In a few instances in some of the years the discrepancy between the cards and the Rex journal is accounted for by receipts shown on the cards being included in receipts shown in the Rex journal in the following year.↩
1. In making his determinations of omitted income for the year 1949, respondent apparently relied on some funeral record cards for funerals occurring in prior years which were not introduced in evidence. Also the first-call booklets offered in evidence start with the date December 25, 1948, so we were not able to cross-check the accuracy of respondent's determination of omitted income for 1949. However, the burden of proving error in respondent's determination was on petitioners and they have offered no evidence to prove such error.↩
1. The amount disallowed includes approximately $312 of claimed deductions for repairs and maintenance which were capitalized in the notice of deficiency, as far as we can determine.↩
2. These amounts do not include payments made by check for utilities and real estate taxes, which are dealt with in another part of this opinion.↩
3. The deduction of expenditures made by Harry in connection with the office of mayor is discussed later.↩
4. SEC. 23. DEDUCTIONS FROM GROSS INCOME. In computing net income there shall be allowed as deductions: * * *
(aa) Optional Standard Deductions for Individuals. - * * *
(3) Method and effect of election. - * * *
(C) If the taxpayer does not signify, in the manner provided by subparagraph (A) or (B), his election to take the standard deduction, it shall not be allowed. If he does so signify, such election shall be irrevocable.↩
1. $250 of the amount disallowed was for real estate taxes, the remainder for utilities. ↩
2. During the year 1954 Harry paid utilities in an amount of $536.97. He excluded from his return for said year the amount of $134.24 (i.e., 25 percent of $536.97) and claimed a deduction for $402.73. Respondent disallowed an additional $180↩
5. SEC. 170. CHARITABLE, ETC., CONTRIBUTIONS AND GIFTS. (a) Allowance of Deduction. - (1) General rule. - There shall be allowed as a deduction any charitable contribution (as defined in subsection (c)) payment of which is made within the taxable year. A charitable contribution shall be allowable as a deduction only if verified under regulations prescribed by the Secretary or his delegate.↩
6. SEC. 293(b) Fraud. - If any part of the deficiency is due to fraud with intent to evade tax, then 50 per centum of the total amount of the deficiency (in addition to such deficiency) shall be so assessed, collected, and paid, in lieu of the 50 per centum addition to the tax provided in section 3612(d)(2)↩. 7. SEC. 6653(b)↩ Fraud. - If any part of any underpayment (as defined in subsection (c)) of tax required to be shown on a return is due to fraud, there shall be added to the tax an amount equal to 50 percent of the underpayment. * * *
8. This discussion does not apply to the year 1952, which was the prosecution year, because consents were not filed for that year.↩